L. C. WRIGHT et al., Appellants, v. GEORGE PIRIE et al., Appellees.

**SPECIFIC PERFORMANCE:** Fraud and Mental Incompetency as Defense. Insufficient evidence of fraud, plus insufficient evidence of mental incompetency, may justify the court, in the exercise of a sound discretion, in refusing specific performance.

*Appeal from Greene District Court.*—E. G. ALBERT, Judge.

APRIL 13, 1920.

PLAINTIFFS appeal from a judgment of the court below, dismissing their petition praying the specific performance of a contract for the sale and exchange of properties.— *Affirmed.*

*Howard & Sayers* and *Church & McCully,* for appellants.

*J. A. Henderson* and *E. B. Wilson,* for appellees.

STEVENS, J.—The contract, specific performance of which is asked in plaintiffs' petition, bears date June 12, 1917, and, by the terms thereof, plaintiffs agreed to convey to the defendant George Pirie the N¼ of the NW¼ of Section 18, Township 22, Range 30, subject to a mortgage of $4,000, and to pay him $5,000 upon the delivery of the papers, which was to be on or before June 20, 1917, and to assign to him a lease of the above tract for that year, in exchange for the SE¼ of Section 24, Township 83, Range 30, all in Greene County, Iowa, subject to mortgages of $8,000 and $5,000, respectively, together with certain personal property, consisting of stock and farm implements, plaintiff to have the crop then growing on the 160-acre tract, which, by a separate oral agreement, defendant was to cultivate and harvest, for which plaintiff agreed to pay him $50 per month, together with the customary price for board furnished by Mrs. Pirie to extra help on the farm. The $4,000 mortgage draws interest at 6 per cent, and the $8,000 and $5,000 mortgages at 5½ and 6 per cent, respectively.

Defendant, for answer to plaintiff's petition, which is in the usual form of actions for the specific performance of contracts, admitted the execution of the contract, but averred that it was procured by the fraud of plaintiff L. C. Wright and others; that it is inequitable and unjust; and that the defendant George Pirie, on account of impaired

health, was incapable, mentally, of understanding and comprehending the nature, scope, and effect of the contract, at the time of its execution.

The defendants were represented in the negotiations, which began on the evening of June 11th, by one Leonard, a real estate agent residing at Grand Junction, and the plaintiff, by one Kirkham, a real estate agent residing at Jefferson, the home of plaintiff, who was engaged in the furriture and undertaking business. Both Wright and Pirie were about 42 years of age, members of the same local lodge, and had known each other for a good many years. Defendant has devoted most of his life to farming, although he has, at times, been employed as a laborer in other occupations. He claims to have but little education, and that he was unable to compute or estimate with reasonable accuracy the aggregate value of his property, or the difference in the values of the various properties of the respective parties.

It was first arranged between Leonard and Kirkham, after a conversation with plaintiff, on the afternoon of June 11th, to solicit defendant to inspect plaintiff's 40-acre tract on the following day, with a view to exchanging his farm therefor. On the morning of the 12th, Leonard went to the home of the defendant in an automobile, from which place he and the defendant went to Jefferson, met Kirkham, and the three together proceeded to inspect the 40-acre tract. After looking over this tract, the same parties went with defendant to Cooper, a near-by town, and then to Jefferson, arriving there about noon. They ate dinner together at a hotel, and, shortly thereafter, went to the residence of plaintiff, where they remained until he came to dinner. Negotiations were opened and continued at plaintiffs' residence until some time in the afternoon, when Kirkham, Leonard, and Wright went with the defendant to his farm, and looked it over, together with his stock and farm imple-

ments; and, while there, an agreement to exchange proper-
ties, upon the terms before stated, was tentatively ar-
rived at. The four then returned to Jefferson, and ate sup-
per at a restaurant, after which they went to a lawyer's
office, where the contract was prepared and signed in dupli-
cate by Wright and Pirie, and taken to the former's home,
where Mrs. Wright signed it; and then the parties named
went to the home of defendant, where they arrived about
midnight, and plaintiff and defendant went into the house,
for the purpose of obtaining the signature of Mrs. Pirie to
the contracts. The papers were taken to the bedroom by
defendant, she having already retired, where they were
signed, and one copy was delivered to plaintiff, who re-
turned with Kirkham and Leonard to Jefferson.

The only claimed misrepresentation of the 40-acre tract
is as to its market value. The defendant testified that,
while they were on the premises, Leonard falsely stated
that plaintiff had a standing offer therefor of $190 per acre,
and that Kirkham affirmed the truth thereof by referring
him to a local banker. Pirie further testified that he did
not inspect the residence on the 40, because he did not
want the place, and so informed Leonard and Kirkham.
In this he is corroborated by plaintiff's tenant, who heard
part of the conversation. At Cooper, Pirie went to a bank
and a store, accompanied by Kirkham, to transact some
business; indeed, from the time Pirie arrived at Jefferson,
on the morning of the 12th, until the plaintiff left him,
about midnight, he was not out of the company of Leonard
or Kirkham, and, most of the time after they met Wright
in the afternoon, was with all three of them.

Plaintiff testified that, when he met the parties at his
home, Pirie proposed a trade of his equity in the quarter
section, and his stock and farm implements, for the 40.
This is denied by the defendant, according to whose tes-
timony nothing was said about the stock or implements

until they arrived at his farm in the evening. Mrs. Pirie testified that she did not know the stock and implements were to be included in the trade until the morning of the 13th, when she read the contract; on the other hand, plaintiff, Kirkham, and Leonard testified that the terms of the trade were fully explained to her in the afternoon, and that she assented thereto. There is much conflict in the evidence as to what occurred during the day, the defendant, in part corroborated by his wife, testifying one way, and Leonard, Kirkham, and Wright, to the contrary. Likewise, we have the usual conflict in the testimony as to the relative values of the two tracts of land. According to the testimony of plaintiff, the 40-acre tract was worth $200, the quarter section, $110 per acre, and the stock and implements, $2,500. Upon this basis, if the contract were carried out, plaintiff would sustain a loss of $1,900. Other witnesses fix the value of the 40-acre tract at from $150, the lowest placed thereon by any of defendant's witnesses, to $210, the highest value placed on it by any of plaintiff's witnesses; and testify that the 160-acre tract was worth from $110 to $140 per acre. A fair estimate, it seems to us, would be about $130 per acre for the quarter and $180 per acre for the 40. Estimated upon this basis, taking the value of the personalty to be $2,500, plaintiff obtained an advantage in the trade of about $2,000.

The testimony regarding the mental condition of Pirie, in substance, is as follows: That he had been considerably worried over the loss of hogs, during the preceding winter; that his wife observed, on the evening of the 12th, that he was pale, although very well that morning; that he retired, shortly after plaintiff left with the contract, but did not sleep; that he expressed the fear to his wife that he had been beaten in the deal; that he was ill, on the morning of the 13th and during the day, and consulted a physician, who testified that he found his heart action ir-

regular, and that he was somewhat nervous and incoherent, and, in his judgment, to some extent unbalanced; that, shortly after June 12th, while plowing corn, he observed plaintiff and Kirkham on the premises; that he got off the plow, and went to the adjoining farm of a neighbor, and said to him:

"I want you to come over; them fellers are here; them fellers that I traded with. I want you to come over, and have them go home."

The neighbor testified that he was crying, when he first saw him, and later in the afternoon, when Wright was present. The neighbor further testified that he told Kirkham he thought they had better go home; that Pirie was not right; and that Kirkham responded that he thought so. too. A niece of defendant's testified that she heard her father tell plaintiff that the defendant was not right, and that plaintiff said, "Yes, I know it." Plaintiff denied this conversation. No other evidence of mental unsoundness was introduced. On the morning of the 13th, defendant went to plaintiff, and offered to trade back; and again on the following day. Plaintiff declined to cancel the contract, telling defendant that he was not in a position to do so. Defendant finally offered $200 to cancel the trade, but this was declined. Later, negotiations for a settlement failed, on account of a disagreement over $50 which plaintiff left at defendant's home, on the afternoon of the 12th, as he testified, to bind the bargain.

It will be observed from the foregoing recital that the evidence offered to sustain defendant's plea of fraud and mental unsoundness is not very conclusive. According to the testimony of defendant, he did not, during the negotiations, undertake to ascertain whether he was getting the value of his farm and stock in the trade or not. He testifies that he was not permitted to go by himself for that purpose, or to consult or advise with some other person, and

that he was unable, under the circumstances, to make the necessary computation to enable him to determine the matter. On the other hand, the testimony on behalf of plaintiff tended to show that he did figure it up, and fully understood it. One witness testified that plaintiff said, in the afternoon of the 12th, that he would stay with the defendant until he traded. It is true that Leonard was the agent of defendant, and it is possible that his conduct was inspired by a good-faith zeal to obtain a commission; but it is significant that he, plaintiff, and Kirkham, or some of them, were constantly in defendant's company, and that he was not left alone at any time until the contract was finally signed by his wife, about midnight. We think it apparent that defendant traded reluctantly. He informed Kirkham and Leonard, in the forenoon, that he did not want the 40, and later declined to consider a residence and some Missouri land which plaintiff had for trade. After spending some hours at plaintiff's home, and a short time at defendant's home, and a short time at defendant's farm, and, according to plaintiff's testimony, after an agreement had been reached, to which Mrs. Pirie consented, plaintiff either delivered $50 to the defendant, or laid same on the table in the kitchen of his home, to bind the bargain, —defendant claiming that he laid it on the table. The parties were not willing to defer the execution of the written contract until the following day, and, for some reason, plaintiff returned, with Kirkham and Leonard, to defendant's home, and went into the house at midnight, with the defendant, to obtain Mrs. Pirie's signature to the contract. These circumstances tend to contradict plaintiff's claim that defendant was seeking and urging the exchange, rather than himself. The record does not reveal plaintiff as a candid witness. As stated, Kirkham, Leonard, and the defendant, after dining at the hotel together, went to the home of plaintiff, shortly after noon, where they

waited for him to come.    Upon cross-examination, plain-
tiff testified that he did not know, when he first saw them,
what the parties wanted, and that one of them told him
they wanted to talk with him.    The fact appears to be
that Kirkham and Leonard had talked the matter over with
Wright in his store, the day before, and that he knew they
were going to take Pirie to look at the 40, the following day.
Nevertheless, he sought to leave the impression that he had
not seen or talked with Kirkham about it for a considerable
time before.    A piece of paper, referred to in the evidence
as Exhibit 5, was handed to plaintiff for inspection, and
he was asked whether he made certain figures thereon.
He admitted that he had probably made part of them, but
said that he did not know whether it was in connection
with a proposed compromise of this controversy or not.
The figures appearing on the exhibit were not of particular
importance, but bore slightly on one matter; but we have
no doubt that they were made by plaintiff, and had ref-
erence to the attempted compromise.    It is scarcely proba-
ble that he would insist upon a specific performance of the
contract if he honestly believed that defendant had the
advantage of $1,900 in the trade, or that he would, under
such circumstances, have declined the offer of $200 by de-
fendant, to trade back.

Standing alone, neither the evidence of fraud nor men-
tal incompetency would probably justify the court in refus-
ing a decree of specific performance; but, when considered
together with all of the circumstances surrounding the
transaction, and the conduct of the parties, we are not pre-
pared to hold that the trial court abused its discretion in
denying the prayer of plaintiffs' petition.    The contract was
inequitable, to the extent, at least, that it allowed plaintiff
a profit of $2,000 or more.    Plaintiff is a business man, and
has had considerable experience in dealing and trading in
real estate; whereas the defendant has been a laborer and

a farmer, and without similar experience; and it is quite possible that, on account of some temporary mental disturbance, he was incapable of resisting the protracted efforts of plaintiff, Kirkham, and Leonard to make the trade. As soon as he was relieved from their presence, it occurred to him that he had made an unfortunate deal, and that he had been taken advantage of; and he promptly went to plaintiff and offered to trade back. He went a second and a third time, finally offering plaintiff $200 to do so. The first visit was made before there could have been any change in the situation of the parties. And, while plaintiff was, of course, not bound to cancel the contract, if fairly made, simply because defendant was dissatisfied therewith, his refusal, under the circumstances disclosed, is not without particular significance.

It is true, as contended by counsel for appellant, that the discretion which the court may exercise in refusing to decree specific performance is not a captious or arbitrary discretion, but a sound, judicial discretion. The rules applicable to cases of this character are familiar, and the citation of authorities is not necessary. The court below, after seeing the witnesses and hearing their testimony, denied specific performance. We are not prepared to say that, in doing so, it abused its proper discretion. We think, however, that plaintiff should have the right, if he so desires, to pursue his remedy at law for damages for the alleged breach of the contract. Subject, therefore, to the right of the plaintiff to prosecute an action for damages, the decree of the court below is—*Affirmed.*

WEAVER, C. J., LADD and GAYNOR, JJ., concur.